1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9              WESTERN DISTRICT OF WASHINGTON
                          AT SEATTLE
10
     ALLEN POTTS,                          CASE NO.  C08-575JLR
11
                    Plaintiff,             ORDER ON MOTION FOR
12                                         SUMMARY JUDGMENT
          v.
13
     CITY OF SEATTLE, et al.,
14
                    Defendants.
15

16        This matter comes before the court on Defendants Officer Dustin Carrell, Officer

17   Kathleen Singleton, and the City of Seattle's motion for summary judgment (Dkt. # 48).
18
     Having reviewed the papers submitted by the parties, for the reasons that follow, the
19
     court GRANTS in part and DENIES in part the motion for summary judgment.
20
21                           I.  BACKGROUND

22        On March 24, 2006, at approximately 10:00 p.m., Clifford Gomes made a 911 call
23
     to the Seattle Police Department requesting that police officers remove a transient male
24
25   from behind the Tully's Roasting Plant located between the 3100 and 3300 blocks of
26

Airport Way South ("Airport Way"). (Declaration of Patrick J. Kang ("Kang Decl.") (Dkt. # 45), Ex. A; Deposition of Clifford A. Gomes ("Gomes Dep.") (Dkt. # 49) at 15:19-16:1.) Mr. Gomes told the 911 dispatcher that there had been a burglary at the Roasting Plant the night before and he believed that the burglars were paying the transient to serve as a lookout. (Kang Decl., Ex A.) Officers Carrell and Singleton ("Officers") responded to the call. (Kang Decl., Ex. A; Second Declaration of Patrick J. Kang ("Second Kang Decl.") (Dkt. # 57), Exs. A & B.)

Officers Carrell and Singleton arrived at the 3100 block of Airport Way at approximately 10:20 p.m. (Second Kang Decl., Ex A.) Upon arriving at the scene, the Officers met with Mr. Gomes. (Deposition of Dustin G. Carrell ("Carrell Dep.") (Dkt. # 49) at 39:4-40:2; Deposition of Kathleen Singleton ("Singleton Dep.") (Dkt. # 49) at 28:24-29:16; Gomes Dep. at 25:17-23.) Mr. Gomes initially pointed out an individual other than Plaintiff Allen Potts whom the Officers admonished for trespassing and sent on his way. (Carrell Dep. at 41:20-44:10.) The parties disagree regarding what Mr. Gomes said that night, if anything, about Mr. Potts.

During the criminal hearing stemming from Mr. Potts' arrest, Mr. Gomes testified that he had very little interaction with the Officers and that he did not accuse Mr. Potts of trespassing. (*See* Gomes Trial Testimony (Dkt. # 25) at 8-9, 12-13.) Mr. Gomes went so far as to say that he had given no indication to the police that he thought Mr. Potts had done something unlawful. (Gomes Trial Testimony at 13.) Mr. Gomes also testified similarly during portions of his deposition taken in this case. (*See* Second

Excerpts of Deposition of Clifford A. Gomes ("Second Excerpts Gomes Dep.") (Dkt. # 45) at 28:24-29:6 (stating he "never made any accusations against Mr. Potts").) During the criminal hearing and his deposition, Mr. Gomes also stated that Mr. Potts was not on Tully's property, but rather that Mr. Potts was on private property to the south. (Gomes Trial Testimony at 12-13; *see also* Third Excerpts of Deposition of Clifford A. Gomes (Third Excerpts Gomes Dep.") (Dkt. # 65) at 78:10-22.) Mr. Gomes did not know whether Mr. Potts had permission to be on this property. (Gomes Dep. at 49:11-14.)

Officers Carrell and Singleton assert that Mr. Gomes told them that Mr. Potts was a trespasser. Mr. Gomes did say during his deposition that he may have accused Mr. Potts of trespassing (*see* Gomes Dep. at 31:2-7, 42:21-43:11); however, these statements conflict with other statements Mr. Gomes made during the same deposition (*see* Second Excerpts Gomes Dep. 28:24-29:6 (denying making any "accusations against Mr. Potts")). Officer Carrell wrote in his police report that Mr. Gomes pointed at Mr. Potts and said, "That's him, that's the guy." (Second Kang Decl., Ex A.) However, Mr. Gomes denies having made this statement. (Second Excerpts Gomes Dep. at 40:19-24.) Officer Singleton wrote in her report that Mr. Gomes told the Officers that he and another employee at the construction site saw Mr. Potts come out from behind a building. (Second Kang Decl., Ex. B.) However, Mr. Gomes' testimony during his deposition on whether he saw Mr. Potts emerge from behind a building is inconsistent. (*Compare* Second Excerpts Gomes Dep. at 29:4-6, *with* Gomes Dep. at 32:6-33:5.) Officer Carrell also wrote in his report that Mr. Gomes said Mr. Potts "became aware of

Police presence and quickly started to walk around the building and then travel northbound on Airport Way S." (Second Kang Decl., Ex. A; *see also* Carrell Dep. at 44:11-16.) However, Mr. Gomes testimony at his deposition was that he did not recall making this statement. (Second Excerpts Gomes Dep. at 29:11-30:23.)

The parties' recollections of what transpired when the Officers contacted Mr. Potts are also divergent. Mr. Potts contends that about the same time the Officers arrived at the Roasting Plant, he was passing by on a routine walk. (Deposition of Allen Potts ("Potts Dep.") (Dkt. # 45) at 31:16-32:13.) Mr. Potts takes walks three to six times a week along the same route from his house on Maynard Avenue down Airport Way to the northern border of Boeing Field. (*Id.*) Immediately before the incident, Mr. Potts was walking on the east side of Airport Way because construction was blocking the sidewalk on the west side of Airport Way. (Potts Dep. at 45:19-46:6.) The parties agree that Officers Carrell and Singleton approached Mr. Potts as he reached the 3300 block of Airport Way. (Second Excerpts of Deposition of Dustin G. Carrell ("Second Excerpts Carrell Dep.") (Dkt. # 45) at 37:20-23; Declaration of Allen Potts ("Potts Decl.") (Dkt. # 46) at 1-2; Kang Decl., Exs. A & B.)

Mr. Potts contends that as he walked north on Airport Way, he heard engines start and had an intensely bright light shined in his face. (Potts Dep. at 49:11-20.) Mr. Potts stopped, put his hands over his eyes to shield them from the lights and, because he thought something was going on behind him, looked back. (Potts Dep. at 50:1-4; Second Declaration of Allen Potts ("Second Potts Decl.") (Dkt. # 58) at 1.) Although he

heard something over a Public Address ("PA") system, Mr. Potts asserts that he could neither understand what was said nor discern the identity of the speaker. (Potts Dep. at 49:20-24, 57:11-14; Second Potts Decl. at 1-2.) The Officers then got out of their cars and approached Mr. Potts. (Potts Dep. at 53:3-6.) One of the Officers grabbed Mr. Potts' right elbow and began to hyperextend it, while the other officer grabbed his left arm and his collar, shoved him toward the other officer, and then placed a leg in front of Mr. Potts' leg and attempted to throw him to the ground. (Potts Dep. at 53:7-14.) During this time, Mr. Potts asked who the Officers were and what they were doing, allegedly not yet realizing that they were Seattle Police Officers. (Potts Dep. at 55:20-56:7, 57:11-14.)

According to Mr. Potts, the Officers eventually maneuvered him to one of the police cars, at which point he saw that they were wearing uniforms. (Potts Dep. at 57:16-17.) As Mr. Potts was leaning against the car, Officer Singleton handcuffed him. (Potts Dep. at 62:16-19.) While he was leaning over the car and handcuffed, Officer Singleton hit Mr. Potts in the back of the head to which Mr. Potts responded, "What the hell are you doing?" (Second Excerpts of Deposition of Allen Potts ("Second Excerpts Potts Dep.") (Dkt. # 57) at 62:12-63:16; Second Potts Decl. at 2.) In response to Mr. Potts' statement, Officer Carrell pulled out his pepper spray and sprayed Mr. Potts in the face. (Second Potts Dep. at 63:15-19; Second Potts Decl. at 2.) Officer Carrell also struck Mr. Potts with his knee several times during the arrest. (Potts Dep. at 56:19-22, 57:24-58:1.) The Officers then placed Mr. Potts in one of the police cars. (Second

Excerpts Potts Dep. at 64:1-9.)  Officer Carrell kicked Mr. Potts while placing him in the police car.  (*Id.*)

Officers Carrell's and Singleton's versions of that evening's events are quite different from Mr. Potts' version.  Officer Carrell stated that he decided to stop Mr. Potts based on his suspicion that Mr. Potts was trespassing.  (Carrell Dep. at 50:6-8.)  According to the Officers, Mr. Gomes made statements to them accusing Mr. Potts of trespassing.  (*See, e.g.*, Second Kang Decl., Exs. A (stating Mr. Gomes pointed at Mr. Potts and said "That's him, that's the guy.") & B (stating Mr. Gomes told the Officers that he and another employee at the construction site saw Mr. Potts come out from behind a building).)  Additionally, Officers Carrell and Singleton each state that they personally saw Mr. Potts trespassing.  (Third Excerpts of Deposition of Dustin G. Carrell ("Carrell Dep.") (Dkt. # 61) at 58:14-16, 59:10-61:14, 65:14-20, 67:16-24; Singleton Dep. at 37:12-38:12.)  In his deposition, Officer Carrell agreed with the statement that he assumed Mr. Potts was trespassing because he saw him on some type of property.  (Second Excerpts Carrell Dep. at 63:4-7.)

The Officers assert that when they approached Mr. Potts in their vehicles and identified themselves as Seattle police officers, Mr. Potts flipped them off and yelled obscenities at them.  (Carrell Dep. at 50:22-51:9; Singleton Dep. at 57:22-59:7.)  As he approached Mr. Potts in his police car, Officer Carrell ordered Mr. Potts to stop and get on the ground through his vehicle's PA system.  (Carrell Dep. at 51:16-52:4.)  Mr. Potts did not comply with Officer Carrell's orders.  (*Id.*)  According to Officer Carrell, the

Officers then got out of their vehicles to make contact with Mr. Potts. (Carrell Dep. at 52:5-14.) As they exited their vehicles, they continued to order Mr. Potts to stop and get on the ground. (Carrell Dep. at 52:5-7; Singleton Dep. at 56:9-57:3.) Mr. Potts did not comply with their orders. (Carrell Dep. at 51:13-53:10; Singleton Dep. 56:25-59:11.)

The Officers contend that at that point they made physical contact with Mr. Potts in order to make him comply with their orders. (Carrell Dep. at 53:5-10, 54:16-19; Singleton Dep. at 70:14-90:3; Second Kang Decl., Exs. A & B.) Mr. Potts resisted. (*Id.*) The Officers struggled with Mr. Potts and eventually pushed him to the front of Officer Carrell's car. (Carrell Dep. at 69:4-11; Singleton Dep. at 76:20-77:1.) The Officers generally admit to using physical force to subdue Mr. Potts and specifically to grabbing his arms. (Carrell Dep. at 54:16-55:23; Singleton Dep. at 62:19-24, 70:4-72:3; Second Kang Decl., Exs. A & B.) During the struggle, Officer Carrell also admits he struck Mr. Potts with his knees several times. (Carrell Dep. at 57:4-7, 68:12-69:2.)

As the Officers continued to struggle with Mr. Potts, Officer Carrell pulled out his pepper spray. (Carrell Dep. at 75:17-76:6; Second Kang Decl., Ex. B.) Officer Carrell warned Mr. Potts that if he did not calm down he would be pepper sprayed. (Carrell Dep. at 75:17-19.) According to the Officers, Mr. Potts then calmed down, but shortly thereafter balled up his fists at which point Officer Carrell pepper sprayed him. (Carrell Dep. at 76:4-77:14, 80:5-10; Singleton Dep. at 82:20-25; Second Kang Decl., Ex B.) The Officers state that Mr. Potts was not yet in handcuffs when he was pepper sprayed. (Second Kang Decl., Ex. B.) Officer Singleton also asserts that during the

struggle, Mr. Potts elbowed her in the face.  (Second Kang Decl., Ex. B.; Singleton Dep. at 103:17-22, 105:3-15.)  After the altercation ended, Mr. Potts was responsive to Officer Carrell's questions.  (Second Kang Decl., Ex. A.)  The Officers placed Mr. Potts in Officer Carrell's car and took him to the police station.  (*Id.*)

After his arrest, Mr. Potts was charged with criminal trespassing, resisting arrest, obstructing a public officer and assault.  (*See* Second Kang Decl., Ex. E.)  The municipal court found probable cause to set the conditions of Mr. Potts' release and continue with the charges against him at a preliminary arraignment hearing.  (*Id.*; Deposition of Michael Finkle ("Finkle Dep.") (Dkt. # 57) at 18:13-24:3.)  The court relied only on the sworn reports submitted to it in making its determination.  (Finkle Dep. at 23:19-24:3.)  At a later hearing where evidence was presented, the Seattle Municipal Court granted the City of Seattle's (the "City") motion to dismiss the charges for lack of probable cause based on Mr. Gomes' testimony.  (Gomes Trial Testimony at 15-16; Second Kang Decl., Ex. E.)

On March 13, 2008, Mr. Potts filed a lawsuit in King County Superior Court asserting eight causes of action including three causes of action under 42 U.S.C. § 1983 (illegal seizure and arrest; unreasonable force; and malicious prosecution) and several state law claims (false arrest and imprisonment; assault and battery; malicious prosecution; and negligent hiring, training and supervision).  (*See* Compl. (Dkt. # 2).)  The action was subsequently removed to this court based on federal question jurisdiction.

## II. ANALYSIS

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing there is no material factual dispute and he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets its burden, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Cline v. Indus. Maint. Eng'g. & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000).

### A. 42 U.S.C. § 1983 Claims

The City contends that summary judgment is warranted on Mr. Potts' § 1983 claims because the Officers are entitled to qualified immunity. Mr. Potts claims that there are disputed issues of material fact and that these claims should proceed to trial.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, __ U.S. __, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In determining whether an officer is entitled to qualified

immunity, the court engages in a two-step analysis.[1]  The court first asks: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If the answer is no, the court need not inquire further.  *Id.*  By contrast, if a constitutional violation could be made out on a favorable view of the parties' submissions, then the court must ask "whether the right was clearly established."  *Id.*  In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id.* at 202 (internal quotation marks and citation omitted).

### 1.  Alleged Unlawful Seizure and Arrest

"The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."  *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1020 (9th Cir. 2009).  Under case law interpreting the Fourth Amendment, police stops fall into three categories.  *See Morgan v. Woessner*, 997 F.2d 1244, 1252 (9th Cir. 1993).  First, a police officer may stop a person for questioning so long as the person is free to leave at any time.  *Id.*  Second, a police officer may "seize" a person for a brief,

---

[1]  In *Pearson*, the Supreme Court clarified that the two-step sequence, although often appropriate, is not mandatory.  Rather, courts must "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson*, __ U.S. __, 129 S. Ct. at 818.  In this matter, the court will address the qualified immunity inquiry in the usual two-step sequence of *Saucier*.

investigatory stop.  *Id.*  A seizure takes place when a "police officer accosts an individual and restrains his freedom to walk away."  *Terry v. Ohio*, 392 U.S. 1, 16 (1968).  Such stops must be supported by a "reasonable suspicion to believe that criminal activity may be afoot."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  Third, the police may make a full-scale arrest, which must be supported by probable cause.  *Morgan*, 997 F.2d at 1252.

When determining whether reasonable suspicion exists, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."  *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).  A "reasonable suspicion may not be based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped."  *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002) (internal quotation marks omitted).  "While reasonable suspicion requires considerably less than proof of wrongdoing by a preponderance of the evidence, an officer must be able to articulate facts creating grounds to suspect that criminal activity may be afoot."  *Ramirez*, 560 F.3d at 1020.  Likewise, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."  *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

"A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was made without probable cause or other justification." *Dubner v. City and County of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001).

> Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe an offense has been or is being committed by the person being arrested. While conclusive evidence of guilt is of course not necessary under this standard to establish probable cause, mere suspicion, common rumor, or even strong reason to suspect are not enough. Under the collective knowledge doctrine, in determining whether probable cause exists for arrest, courts look to the collective knowledge of all the officers involved in the criminal investigation. Where the facts or circumstances surrounding an individual's arrest are disputed, the existence of probable cause is a question for the jury.

*Harper v. City of Los Angeles*, 533 F.3d 1010, 1022 (9th Cir. 2008) (internal quotation marks and citations omitted). The Ninth Circuit also teaches that "[i]n the context of qualified immunity, determinations that turn on questions of law, such as whether the officers had probable cause or reasonable suspicion to support their actions, are appropriately decided by the court. However, a trial court should not grant summary judgment when there is a genuine dispute as to the facts and circumstances within an officer's knowledge or what the officer and claimant did or failed to do." *Hopkins v. Bonvicino*, __ F.3d __, No. 07-15102, 2009 WL 2052987, at *4 (9th Cir. July 16, 2009) (internal quotation marks and citation omitted).

The Officers argue that qualified immunity is appropriate because they "had a reasonable basis at the time to conclude that they had probable cause to contact and then

to arrest plaintiff for trespass based on information received from Mr. Gomes, and there

[sic] own observations." (Mot. (Dkt. # 48) at 8.) Mr. Potts contends that a question of

fact exists as to whether reasonable suspicion or probable cause existed to seize and

arrest him when no one identified him as doing anything unlawful. The court begins its

analysis by, determining whether the facts alleged, taken in the light most favorable to

Mr. Potts, show the Officers' conduct violated a constitutional right.

### i. Constitutional Right

### a. Seizure

The Officers have repeatedly asserted that there are seven "undisputed" facts,

which, by themselves, establish a reasonable suspicion to stop Mr. Potts for an

investigatory stop:

1) The officers were dispatched to the 3100 block of Airport Way based on a possible burglary/trespass.
2) They contact Mr. Gomes, who was in charge of the property, and are told people are on the property, and the property has been robbed recently.
3) The officers locate one individual on the north portion of the property who is not authorized to be on the property and issue him a trespass admonishment.
4) The officers and Mr. Gomes then move to the south side of the property on reports of other trespassers on the property.
5) All three arrive at the south side of the property and all witness plaintiff trespassing[.]
6) Officer Carrell identifies himself and orders plaintiff to stop and show his hands multiple times.
7) Plaintiff did not comply with Officer Carrell's orders and continues moving towards the officers.

(Reply (Dkt. # 64) at 3.) However, several of these facts are disputed, most significantly

the fourth and fifth facts, that Mr. Gomes reported other trespassers on the property and

that the Officers and Mr. Gomes witnessed Mr. Potts trespassing.  Mr. Potts submits

statements made by Mr. Gomes as well as one of the Officers that Mr. Gomes did not

make any reports or statements to the Officers regarding Mr. Potts trespassing on Tully's

property or coming out from behind a Tully's building.  (Second Excerpts Gomes Dep.

at 28:24-29:6; Gomes Trial Testimony at 8-9, 12-13; *see also* Carrell Dep. at 48:5-19;

Second Excerpts Carrell Dep. at 64:25-65:13 (stating that Mr. Gomes did not identify

Mr. Potts as a trespasser).)  Although Mr. Gomes' statements are not entirely consistent,

it would be improper for the court, at this stage in the proceedings, to determine which

of Mr. Gomes' various statements represents what actually happened.

Viewing the facts in the light most favorable to Mr. Potts, if there were no reports

of additional trespassers and Mr. Gomes did not accuse Mr. Potts of trespassing, then the

only fact supporting a suspicion of Mr. Potts was that he was in an area of expected

criminal activity, a fact that by itself is not enough to support a reasonable and

particularized suspicion of Mr. Potts.  *See Wardlow*, 528 U.S. at 124.  In those cases

where a court has relied on presence in an area of criminal activity, it has been combined

with another fact, *e.g.*, attempting to flee.  *See id.*  ("In this case, moreover, it was not

merely respondent's presence in an area of heavy narcotics trafficking that aroused the

officers' suspicion, but his unprovoked flight upon noticing the police.").

Moreover, Officer Carrell's assumption that Mr. Potts was trespassing because he

saw him on some type of property, is similar to the type of broad categorical suspicions

that courts have previously rejected.  (Second Excerpts Carrell Dep. at 63:4-7.)  If seeing

someone on property, without any accusations from an individual responsible for the property, is enough by itself to support a reasonable suspicion of trespassing, then a police officer could stop virtually anyone walking by a building or across a parking lot for an investigatory stop. The law does not support such board categorical suspicions. *See Sigmond-Ballesteros*, 285 F.3d at 1121.

Viewing the facts in the light most favorable to Mr. Potts, the facts alleged show that the Officers' conduct violated a constitutional right. Having determined that a constitutional violation could be made out on the unlawful seizure claim, the court turns to the second part of Mr. Potts unlawful seizure and arrest claim.

### b. Arrest

The Officers also contend they are entitled to qualified immunity on Mr. Potts' unlawful arrest claim. Under Seattle Municipal Code § 12A.08.040(B)(1), "A person is guilty of criminal trespass in the second degree if he or she knowingly enters or remains unlawfully in or upon premises of another under circumstances not constituting criminal trespass in the first degree." Viewing the facts in the light most favorable to Mr. Potts, Officers were called to the scene to investigate a possible trespass, the Officers located one person who was trespassing and gave him a warning. Mr. Gomes, the 911 caller, did not identify Mr. Potts as a trespasser; however, Officers observed Mr. Potts walking on a piece of property. The Officers approached Mr. Potts in their vehicles, announced commands at him over their PA system, whereupon Mr. Potts looked over his shoulder. The Officers then grabbed Mr. Potts without responding to his questions about who they

were or what they were doing.  Mr. Potts was soon thereafter placed under arrest.  On the trespassing charge, the facts as known by the Officers had not changed from their initial seizure.  Having determined that the Officers did not have reasonable suspicion to seize Mr. Potts, on the same facts, the Officers clearly did not meet the more demanding probable cause standard to arrest Mr. Potts for trespassing. [2]  The Officers did not have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that Mr. Potts was trespassing.  *See Harper*, 533 F.3d at 1022.[3]  Under these facts, probable cause did not exist to arrest Mr. Potts for trespassing.

The Officers also argue that they had probable cause to arrest Mr. Potts for resisting arrest and obstruction.   "A person is guilty of resisting arrest if he or she intentionally prevents or attempts to prevent a peace officer from *lawfully arresting* him or her."  SMC § 12A.16.050(A) (emphasis added).  In relevant part a person is guilty of obstruction "if, with knowledge that the person obstructed is a public officer, he or she:

---

[2] Additionally, at least one Washington court has refused to find probable cause existed as a matter of law where a person was arrested for trespassing without being given an opportunity to explain himself.  *See State v. Blair*, 827 P.2d 356, 359 (Wash. Ct. App. 1992) (holding that an officer lacked probable cause to arrest a suspect for trespassing where he failed to ask the suspect where he was going and for what purpose).

[3] Defendants repeatedly state that if the Officers made a "mistake" that they are still entitled to qualified immunity.  (*See, e.g.,* Mot. at 1, 7; Reply at 4, 5 n.5.)  Defendants correctly note that probable cause for an arrest may exist where an officer makes a reasonable mistake of fact.  *See United States v. Miguel*, 368 F.3d 1150, 1153-54 (9th Cir. 2004).  Defendants have not argued what particular fact was mistaken by the Officers; rather, they make blanket statements that even if the court believes Mr. Potts' story the Officers had reasonable suspicion to seize Mr. Potts and probable cause to arrest him and are thus entitled to qualified immunity.  Without more specific direction from Defendants about what reasonable mistake of fact the Officers made, the court will not consider this argument.

1. Intentionally and physically interferes with a public officer; or 2. Intentionally hinders or delays a public officer by disobeying an order to stop given by such officer . . . ." SMC § 12A.16.010. The statute also provides that, "[n]o person shall be convicted of violating this section if the Judge determines, with respect to the person charged with violating this section, that the public officer was *not acting lawfully* in a governmental function." SMC § 12A.16.010(B) (emphasis added). Having determined, under the facts viewed in the light most favorable to Mr. Potts, that his seizure and arrest for trespassing were not lawful, then the court cannot find that probable cause existed for arresting Mr. Potts for obstruction or resisting arrest. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 920 (9th Cir. 2001) ("If the officers could not lawfully arrest [the Plaintiff] for battery, the officers could also not arrest [the Plaintiff] for resisting arrest.").

Finally, the Officers assert that they had probable cause to arrest Mr. Potts for assault because he hit Officer Singleton; however, Mr. Potts denies elbowing Officer Singleton. (*See* Second Potts Decl. at 2.) Although Mr. Gomes' testimony tends to support the Officers' assertion that Mr. Potts struck Officer Singleton, the court is not entitled to weigh the evidence at this stage of the proceedings. Accordingly, the court cannot say as a matter of law that the Officers had probable cause to arrest Mr. Potts for assault.

### ii. Clearly Established Law

Having determined that a violation of the Fourth Amendment could be made out on a favorable view of Mr. Potts' evidence, the court must ask whether the right was clearly established. *Saucier*, 533 U.S. at 201. In other words, the court must determine whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id*. at 202. The Officers do not argue that the constitutional right at issue was not clearly established at the time of the incident. In reviewing relevant case law it is clear that at the time of this incident it was well-established that a seizure is only justified by reasonable suspicion and an arrest is only justified by probable cause. *See Morgan*, 997 F.2d at 1259. The court determines the contours of the right to be free from unlawful seizure and arrest were sufficiently clear and that a reasonable officer faced with the situation would have understood that what he did violated that right. The Officers are not entitled to qualified immunity on the unlawful seizure and arrest claim.

### 2. Excessive Force

Courts analyze Fourth Amendment excessive force claims under the framework established by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989). The basic test under *Graham* is one of objective reasonableness. This requires courts to balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against "the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396; *see Tekle v. United States*, 511 F.3d 839, 844-45 (9th Cir. 2007); *Smith v.*

*City of Hemet*, 394 F.3d 689, 700 (9th Cir. 2005) (en banc); *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003). In doing so, "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them . . . ." *Graham*, 490 U.S. at 397. "The question is not simply whether the force was necessary to accomplish a legitimate police objective; it is whether the force used was reasonable in light of *all* the relevant circumstances." *Hammer v. Gross*, 932 F.2d 842, 846 (9th Cir. 1991). The Supreme Court cautions that "[t]he 'reasonableness' of a use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

In the Ninth Circuit, the objective reasonableness inquiry under *Graham* is a three-step analysis. First, the court must assess the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force used. *Miller*, 340 F.3d at 964. Second, the court must assess the importance of the government interests at stake by considering the *Graham* factors: (1) the severity of the crime, (2) whether the suspect posed an immediate threat to the safety of the officer and others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Id.* Third, the court must balance "the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. However, "[t]he use of a force against a person who is helpless or has been subdued is constitutionally prohibited." *Motley v. Parks*, 432 F.3d 1072, 1088 (9th Cir. 2005).

The court first assesses the gravity of the intrusion on Mr. Potts' interests by evaluating the type and amount of force used. Mr. Potts contends that during his encounter with the Officers, he did not try to strike the Officers, that he was repeatedly hit with at least one of the Officers' knees, that he was thrown up against one of the Officers' vehicles, and that he was handcuffed before he was hit, pepper sprayed and kicked. (Potts Dep. at 53:3-14, 56:13-22, 57:24-58:1; Second Excerpts Potts Dep. 62:10-64:9; Second Potts Decl. at 2; Carrell Dep. at 54:16-57:10; Singleton Dep. at 62:19-90:16; Second Kang Decl., Exs. A & B.) The force used against Mr. Potts was significant.

Moving to the second part of the analysis, the court must assess the importance of the governmental interests at stake by considering the *Graham* factors: (1) the severity of the crime, (2) whether the suspect posed an immediate threat to the safety of the officer and others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. A review of the factors demonstrates that the level of importance of the government interests at stake was not high. The Officers initially stopped Mr. Potts on suspicion of second-degree trespassing, a misdemeanor offense. *See* SMC § 12A.08.040(B)(2). The crime was not severe. Taking the facts in the light most favorable to Mr. Potts, he was not an immediate threat to the safety of the Officers

or others[4] as he was handcuffed when he was hit, pepper sprayed and kicked. (Second Excerpts Potts Dep. 62:10-64:9; Second Potts Decl. at 2.) Third, Mr. Potts asserts that he was handcuffed and not resisting when he was hit by Officer Singleton and pepper sprayed and kicked by Officer Carrell. (*Id.*) No one asserts that Mr. Potts was attempting to flee. (*See, e.g.*, Gomes Dep. at 53:2-7; Carrell Dep. at 50:22-25.)

Balancing the gravity of the intrusion against the government's interests, the court cannot conclude that the Officers' use of force was constitutionally reasonable. Instead, when the facts are viewed in the light most favorable to Mr. Potts, an officer in the Officers' position could not reasonably have concluded that the force used was reasonable under the circumstances. The court acknowledges that the Officers were forced to make split-second judgments regarding the appropriate amount of force necessary in a rapidly evolving situation. Accepting the evidence in the light most favorable to Mr. Potts, it is evident that the key question—whether the force used here was objectively reasonable—is a matter that cannot be resolved in favor of the Officers on summary judgment. As the Ninth Circuit has repeatedly emphasized, "the reasonableness of force used is ordinarily a question of fact for the jury." *Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997); *see Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).

---

[4] It should be noted that Mr. Potts does not appear to dispute that he initially resisted the Officers when he encountered them, contending that he did not know that they were police officers.

Having determined that a violation of the Fourth Amendment could be made out on a favorable view of Mr. Potts' evidence, the court must ask whether the right was clearly established. *Saucier*, 533 U.S. at 201. In other words, the court must determine whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id*. at 202. The Officers do not argue that the law regarding the use of physical force and pepper spray against an individual who had been subdued was not clearly established at the time of incident. Several courts have found similar uses of force unreasonable as a matter of law. *See, e.g.*, *Henderson v. Munn*, 439 F.3d 497, 502-03 (8th Cir. 2006) (affirming district court's denial of qualified immunity where police officer pepper sprayed arrestee after he was subdued and handcuffed); *LaLonde v. County of Riverside*, 204 F.3d 947, 961(9th Cir. 2000) ("[I]n a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of [pepper spray]. . . constitutes excessive force."); *see also Motley*, 432 F.3d at 1088 ("The use of a force against a person who is helpless or has been subdued is constitutionally prohibited."); *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002). The court finds that at the time of the incident the law was clearly established that the use of pepper spray and physical force against an individual who had been subdued constitutes excessive force. The Officers are not entitled to qualified immunity on Mr. Potts' excessive force claim.

### 3. Malicious Prosecution

The Officers contend that summary judgment is warranted on Mr. Potts' § 1983 malicious prosecution claim because Mr. Potts has presented no evidence that they pressured the prosecutor to file charges and/or omitted information or included false information in the incident report. They also contend that the Seattle Municipal Court's determination that probable cause existed for the arrest defeats this claim.[5] Mr. Potts contends that he has produced evidence that the Officers recklessly or intentionally supplied false information in their reports which the prosecutor relied on to file charges.

Under § 1983, in order to succeed on a malicious prosecution claim the plaintiff "must show that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004). These actions are not limited to prosecutors and may be brought against other persons who have wrongfully caused the charges to be filed. *Id.* There is a rebuttable presumption that a prosecutor exercises independent judgment in deciding to file criminal charges, thus immunizing the investigating officers from liability for injuries suffered after the charging decision. *Id.* at 1067. This presumption may be rebutted with evidence that the officers, "improperly exerted pressure on the prosecutor,

---

[5] Other than asserting that the finding by the Seattle Municipal Court establishes probable cause, the Defendants have not explained why that determination would be binding on this court. The court determines that because the Municipal Court's probable cause finding was made only on the report filed by the Officers in this case, it is not binding on this court.

knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Id.* "[A] plaintiff's account of the incident in question, by itself, does not overcome the presumption of independent judgment." *Newman v. County of Orange*, 457 F.3d 991, 994 (9th Cir. 2006). "A police officer who maliciously or recklessly makes false reports to the prosecutor may be held liable for damages incurred as a proximate result of those reports." *Blankenhorn v. City of Orange*, 485 F.3d 463, 482 (9th Cir. 2007); *see also Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126-27 (9th Cir. 2002) (determining that allegations that a coroner "deliberately lied about the autopsy in the autopsy report" stated a claim under § 1983).

In this case, Mr. Potts argues that the Officers presented false information in their reports including that Mr. Gomes identified Mr. Potts as a trespasser, that when Mr. Potts became aware of police presence that he started to walk around the building and that Mr. Potts yelled obscenities at the Officers as they attempted to make contact with him. Mr. Gomes the only other witness to the events has offered testimony that directly contradicts the Officers' reports regarding the incident. Although Mr. Gomes has also offered testimony that would support some, but not all, of what was said in the reports the court is not in a position, at this stage, to determine which of Mr. Gomes' versions of the events is correct. (*Compare* Second Kang Decl., Ex. A (stating Mr. Gomes pointed at Mr. Potts and said "That's him, that's the guy."), *with* Second Excerpts Gomes Dep. at 40:19-41:6 (denying same); *compare* Second Kang Decl., Ex B. (stating Mr. Gomes

told the Officers that he and another employee at the construction site saw Mr. Potts come out from behind a building), *with* Second Excerpts Gomes Dep. at 28:24-29:6, Potts Dep. 31:2-33:13 (clarifying regarding same); *compare* Kang Decl., Ex. A; Carrell Dep. at 44:11-18 (stating that Mr. Gomes told him Mr. Potts became aware of the Officers' presence and quickly started to walk around the building and travel north on Airport Way), *with* Second Excerpts Gomes Dep., 29:11-30:23 (not recalling same); *compare* Carrell Dep. at 50:22-51:9; Singleton Dep. at 57:22-59:7 (asserting that when they approached Mr. Potts in their vehicles and identified themselves as Seattle police officers he flipped them off and yelled obscenities at them), *with* Gomes Dep. at 53:2-25 (denying same).) For purposes of summary judgment, the court may not ignore the existence of Mr. Gomes' statements supporting Mr. Potts' version of the events when deciding whether Mr. Potts has overcome the presumption of prosecutorial independence.

As explained in *Newman*, corroboration of a plaintiff's version of events by an independent witness can help overcome the presumption of prosecutorial independence. 457 F.3d at 994-95; *see also Barlow v. Ground*, 943 F.2d 1132, 1137 (9th Cir. 1991) (reversing grant of summary judgment on malicious prosecution claim where officers omitted information from their reports, offered conflicting stories, and an independent witness confirmed plaintiff's story); *Borunda v. Richmond*, 885 F.2d 1384, 1390 (9th Cir. 1988) (holding that plaintiffs presented enough evidence to challenge presumption that prosecutor exercised independent judgment where prosecutor had no other

information available to him other than the police report, police omitted information in the police report and the officers' versions of events were conflicting). If Mr. Gomes did not identify Mr. Potts as a trespasser, did not state that Mr. Potts walked around the building in response to the police presence and/or corroborates Mr. Potts' statement that he did not yell at the Officers and make hand gestures, a reasonable jury could conclude that the Officers falsely represented the evidence. Mr. Potts has produced enough evidence to create a genuine issue of material fact regarding whether the prosecutor exercised independent judgment. Accordingly, the court denies summary judgment on Mr. Potts' § 1983 malicious prosecution claim.

## B. State Law Claims[6]

### 1. Assault and Battery

Battery is an intentional act resulting in "harmful or offensive contact with a person," and "[a]n assault is any act of such a nature that causes apprehension of a battery." *McKinney v. Tukwila,* 13 P.3d 631, 641 (Wash. Ct. App. 2000). Although Washington recognizes a form of qualified immunity for law enforcement officers, that immunity is not "available for claims of assault and battery arising out of the use of excessive force to effectuate an arrest." *Staats v. Brown,* 991 P.2d 615, 627-28 (Wash. 2000. As discussed more fully above, there are disputed issues of fact regarding the

---

[6] The Officers contend that the public duty doctrine bars Mr. Potts' tort based claims; however, they have not demonstrated that the public duty doctrine applies to bar the state law claims on these facts.

encounter between Mr. Potts and the Officers.  Accordingly, the court denies summary judgment on Mr. Potts' assault and battery claims.

### 2. False Arrest

Under Washington law, false arrest is "the unlawful violation of a person's right of personal liberty or the restraint of that person without legal authority." *Bender v. Seattle*, 664 P.2d 492, 499 (Wash. 1983).  Because the court has determined, viewing the evidence in the light most favorable to Mr. Potts, that a violation of the Fourth Amendment could be found for illegal seizure and arrest, Mr. Potts' state law claim for false arrest survives.  *See State v. Gonzales*, 731 P.2d 1101, 1107 (Wash. Ct. App. 1986) (stating that arrest without probable cause violates the Fourth Amendment and article 1, section 7 of the Washington State Constitution).

### 3. Malicious Prosecution

Under Washington law, "[t]o maintain an action for malicious prosecution, the plaintiff must allege and prove (1) that the prosecution claimed to have been malicious was instituted or continued by the defendant; (2) that there was want of probable cause for the institution or continuation of the prosecution; (3) that the proceedings were instituted or continued through malice; (4) that the proceedings terminated on the merits in favor of the plaintiff, or were abandoned; and (5) that the plaintiff suffered injury or damage as a result of the prosecution." *Peasley v. Puget Sound Tug & Barge Co.*, 125 P.2d 681, 687 (Wash. 1942).  "Of these five elements, malice and want of probable cause constitute the gist of such an action." *Id.* at 688.  Malice may be inferred from a

lack of probable cause, but this is not a necessary deduction. *Id.* "[I]f a factual issue as to whether probable cause or malice exists, the question must be submitted to the jury." *Bender v. City of Seattle*, 664 P.2d 492, 501 (Wash. 1983).

An officer may establish probable cause as a matter of law if he shows that he "made to the prosecuting attorney a full and fair disclosure, in good faith, of all the material facts known to him, and that the prosecuting attorney thereupon preferred a criminal charge and caused the arrest of the accused . . . ." *Id.* at 500 (quoting *Peasley*, 125 P.2d at 688-89). However, if there is an issue of fact regarding whether the prosecuting witness made a full and truthful disclosure to the prosecuting attorney then the issue must be submitted to the jury. *Id.* at 500-01.

The Officers argue that Mr. Potts' state law malicious prosecution claim fails because of a lack of malice and because the Officers made a full and fair disclosure to the prosecutor of all material facts known to them. As more fully explained above, the court has determined looking at the facts in the light most favorable to Mr. Potts that there was not probable cause for his arrest. If a jury found probable cause lacking, it could also infer malice on the part of the Officers. *See Peasley*, 125 P.2d at 688. Such factual issues regarding malice and a want of probable cause must be submitted to a jury. *See Bender*, 664 P.2d at 501. Furthermore, there are factual issues regarding whether the Officers made a full and fair disclosure of all material facts, and thus the issue must go to a jury. *See id*. at 500-01. The court denies summary judgment on this claim.

### 4. Negligent Hiring, Training, and Supervision

In his complaint, Mr. Potts alleges that the City is liable for the negligent hiring, training, and supervision of Officers Carrell and Singleton. Even where an employee is acting outside the scope of employment, an employer may owe a limited duty to foreseeable victims "to prevent the tasks, premises, or instrumentalities entrusted to an employee from endangering others." *Niece v. Elmview Group Home,* 929 P.2d 420, 426 (Wash. 1997). The breach of this duty gives rise to causes of action for negligent hiring, retention, and supervision, which are separate and distinct from vicarious liability. *Id.* An employer may be liable for negligent supervision of employees if "the employer knew, or in the exercise of reasonable care should have known, that the employee presented a risk of danger to others." *Id.* "To establish a cause of action for negligent hiring, the [plaintiff] must show that (1) [the defendant] knew or, in the exercise of ordinary care, should have known of [the employee's] unfitness at the time of hiring, and (2) the negligently hired employee proximately caused the resulting injuries." *Lester v. Town of Winthrop*, 939 P.2d 1237, 1242 (Wash. Ct. App. 1997).

In this case, Mr. Potts has failed to present any evidence supporting his claims for negligent hiring, training, and supervision. In his response to Defendants' motion for summary judgment, Mr. Potts did not discuss these claims and failed to highlight any evidence pointing to knowledge on the part of the City that the Officers were unfit at the time of hiring or that the City knew the Officers presented a risk of danger to others. Similarly, Mr. Potts has not presented any evidence regarding the standard of care for

training police officers and that the City breached that standard of care.  Accordingly, the court grants Defendants' motion for summary judgment with respect to Mr. Potts' negligent hiring, training, and supervision claims.

## C.  *Respondeat Superior*

The City argues that it may not be held vicariously liable for any of the Officers' actions and therefore Mr. Potts' *respondeat superior* claim must be dismissed.  The law governing whether a municipality may be held liable under the doctrine of *respondeat superior* differs according to whether the claims are based on 42 U.S.C. § 1983 or state law.

### 1.  42 U.S.C. § 1983 Claims

"[A] municipality cannot be held liable *solely* because it employs a tortfeasor— or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690 (1978).  "A municipality may be held liable under § 1983 only where an 'action pursuant to official municipal policy of some nature causes a constitutional tort.'"  *Harper v. City of Los Angeles*, 533 F.3d 1010, 1024 (9th Cir. 2008) (quoting *Monell,* 436 U.S. at 691).

In the present case, Mr. Potts does allege that the City had policies in place that allowed the Officers to violate his rights.  (*See* Compl. ¶¶ 16, 20.)  However, on summary judgment, Mr. Potts has not directed the court to any evidence indicating that the actions of the Officers were "pursuant to official municipal policy" and that such

policy actually caused the violation of his constitutional rights. Accordingly, the City

may not be held vicariously liable for Mr. Potts' § 1983 claims. The court grants

summary judgment for the City and dismisses this claim.

###   2.  State Law Claims

In contrast to Mr. Potts' § 1983 claims, liability for Mr. Potts' state law claims

may properly be imposed on the City under the doctrine of *respondeat superior*. In

Washington, "once an employee's underlying tort is established, the employer will be

held vicariously liable if 'the employee was acting within the scope of his

employment.'" *Robel v. Roundup Corp.*, 59 P.3d 611, 620 (Wash. 2002) (quoting

*Dickinson v. Edwards,* 716 P.2d 814, 820 (Wash. 1986)). "An employer can defeat a

claim of vicarious liability by showing that the employee's conduct was (1) intentional

or criminal and (2) *outside the scope of employment*." *Robel,* 59 P.3d at 620.

Washington courts have recognized that a local government may be held vicariously

liable for the state law torts of its police officers. *See, e.g.*, *Coffel v. Clallam County*,

735 P.2d 686, 691 (Wash. Ct. App. 1987) ("[S]ummary judgment in favor of the County

also was improperly granted, as any liability of the officers may be imposed on the

County by reason of the doctrine of *respondeat superior*.").

Although there is a section in the Defendants' brief titled "No Respondeat

Superior Liability," Defendants provide no meaningful discussion of why the City is

entitled to summary judgment on this claim. The court determines that merely including

a heading, without meaningful discussion of the issue with citation to relevant case law

and application of that law to the facts of the case, is insufficient to show that the City is entitled to judgment as a matter of law on this claim. On this basis, the court will not grant summary judgment in favor of the City on Mr. Potts' *respondeat superior* claim with regard to the state law claims.

### III. CONCLUSION

For the foregoing reasons, the court GRANTS the summary judgment motion with respect to claims against the City of Seattle for negligent hiring, supervision and training, as well as liability under a theory of *respondeat superior* for 42 U.S.C. § 1983 violations and DISMISSES those claims. The court DENIES the motion as to the remaining claims.

DATED this 24th day of August, 2009.

JAMES L. ROBART
United States District Judge